UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

# 12 CIV 9272

---------------------------------x

MICHAEL BERTUZZI, Individually and on
Behalf of All Others Similarly Situated,

                       Plaintiff,

     vs.

NEPTUNE TECHNOLOGIES &
BIORESSOURCES INC., HENRI
HARLAND, FRÉDÉRIC HARLAND and
ANDRÉ GODIN,

                 Defendants.

---------------------------------x

Civil Action No.

CLASS ACTION

COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS

RECEIVED
DEC 19 2012
U.S.D.C. S.D. N.Y.
CASHIERS

DEMAND FOR JURY TRIAL

Plaintiff Michael Bertuzzi ("plaintiff"), individually and on behalf of all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of Neptune Technologies & Bioressources Inc.'s ("Neptune" or the "Company") press releases, Securities and Exchange Commission ("SEC") filings, court filings, analyst reports, media reports and other publicly disclosed reports and information about the defendants. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of persons who purchased the common stock of Neptune between December 12, 2011 and November 8, 2012 (the "Class Period"). The proposed class action includes purchasers in Neptune's September 25, 2012 registered public stock offering priced at $4.10 per share, and charges Neptune and its top officers with violations of the federal securities laws.

2.      Neptune is a Quebec, Canada-based biotechnology company that develops and commercializes krill oil products extracted from Antarctic krill for the nutraceutical, pharmaceutical, cosmetic, and pet food markets. The Company's stock has been listed on the NASDAQ Capital Market ("Nasdaq") under the ticker symbol "NEPT" since August 2007. The Company's primary product offerings are Neptune Krill Oil ("NKO"), a marine oil that purports to provide a blend of nutritional elements; Neptune Krill Aquatein ("NKA"), a protein concentrate that comprises marine amino acids; Ecokrill Oil; and OPA3 for the functional food and biopharmaceutical markets. NKO is marketed as a treatment for conditions such as premenstrual syndrome, high cholesterol,

inflammation, osteoarthritis, and attention deficit hyperactivity disorder. The Company distributes its products globally to retailers who repackage and sell it under their own brand names.

3.      Pursuant to agreements dating back to the Company's founding, Neptune's founder and Chief Executive Officer ("CEO"), Henri Harland ("H. Harland"), receives 1% of any Neptune sales and other income as a royalty for an indeterminate period of time that is paid semi-annually. Receipt of this royalty incentivized H. Harland to push production levels to their limits throughout the Class Period.

4.      Meanwhile, throughout the Class Period, defendants lauded the future benefits of the massive expansion underway at the Company's Sherbrooke production plant – the Company's sole production facility which housed all of its inventory. As further detailed below, defendants' promises included exponentially expanded production facilities, new state of the art production technologies, and increased profit margins, revenues and earnings.

5.      The investment community was elated and the price of Neptune stock soared in response to these statements – reaching a Class Period high of $5.14 per share in intraday trading on July 2, 2012. With the Company's stock price artificially inflated, on September 25, 2012, defendants undertook a $34+ million registered public stock offering, raising capital defendants said would be used in part to fund the expansion of Neptune's sole production facility, the Sherbrooke facility. In order to facilitate investor interest in the $34+ million stock offering, defendants emphasized their "confidence" that Neptune's "first half revenues for fiscal 2013 [would] be in the range of $13.6 million to $14.1 million compared to $8.6 million in revenues during the first half of fiscal 2012" – *a more than 55% improvement*.

6.      Meanwhile, unbeknownst to investors , in truth and in fact the Company's business and financial prospects were nowhere near as strong as defendants had represented. The Company

was chasing market share at the cost of margins and would see its profit margins collapse by the end of the Class Period, plummeting from 51% in the same period one year earlier to 38%, as reported October 15, 2012. Defendants were forced to admit that the "decrease in the gross profit percentage" resulted both from the Company's "aggressive policy of volume discount [to] help[] secure market share" and "the ongoing expansion at the Sherbrooke plant," which defendants explained had "impacted the production by slowing down certain production steps and contributed to supplemental production costs." More crucially however, in their reckless scramble to substantially expand the Sherbrooke production facility, defendants had wholly failed to obtain the necessary building permits, despite being warned by an official at Quebec's Ministry of Environment that regulatory oversight of any expansion would be required. Defendants also installed equipment that facilitated their storing dangerously high levels of acetone, a paint-thinner type chemical used in krill oil extraction, at the Sherbrooke production plant that far exceed the limits established in 2002 by the Quebec Ministry of Environment.

7. The price of Neptune stock declined precipitously between November 8, 2012 before the close of trading, when an explosion and fire destroyed the Sherbrooke production facility, and November 26, 2012, when the Company's stock, which had been halted by the Nasdaq following the explosion, resumed trading and plunged $1.18 per share – *approximately 32% of its closing price on November 7, 2012, the evening before the explosion* – on extremely high trading volume of more than 3.8 million shares trading.

8. The November 8, 2012 explosion and fire completely destroyed Neptune's Sherbrooke production plant, which was still in operation, and damaged the $21 million expansion facility then under construction. Since all of Neptune's krill oil products were manufactured at the plant that was destroyed, the Company's entire manufacturing capabilities have been indefinitely

- 3 -

halted.  Neptune's entire inventory of krill oil products was also stored at the production plant and was destroyed as well.  The Company also faces substantial environmental remediation costs at the former production site which was decimated in the explosion.



9.      Initial reports determined that the fire and explosion were started in one of the plant's reservoirs containing highly flammable acetone.  By November 16, 2012, it was being reported by Radio Canada that the Quebec Ministry of Environment had issued Neptune two notices of non-compliance, one addressing excessive levels of acetone present on the premises at the time of the explosion and another for failing to obtain a permit to expand its Sherbrooke production facilities.

10.     According to a report published by Radio Canada on November 16, 2012, in 2002 the Company had been granted authorization to store a total of 33,000 liters of acetone outside the Sherbrooke production plant, and another 6,000 liters inside.  However, Urgence-Environnement technicians dispatched to the scene of the November 8th fire calculated that approximately 15,000 liters of acetone had burned – creating a huge cloud of black smoke – and another 27,000 liters were

contained in other reservoirs at the plant. Based on those calculations, Radio Canada estimated that the Neptune plant housed at least 3,000 liters more than it was authorized to house.

11.     Radio Canada also reported that the Company had failed to obtain permission to begin its expansion work on the Sherbrooke production plant, which commenced during fiscal 2011 and was designed to triple the production capacity of the site at a cost of more than $20 million. A Ministry of Environment official also told Radio Canada that defendants had been prewarned that a permit was required for the expansion.

12.     Beyond the potentially tens of millions of dollars in civil and criminal liability the Company faces, including fines, penalties and cleanup costs, the Company's entire business has been threatened by the explosion. The Company is no longer able to produce its own krill oil and has been forced to assist its distribution customers in finding replacement sources for krill oil – from its competitors. The Company's claims that these third-party sourcing arrangements are only temporary are dubious in light of the indefinite period of time it will take defendants to rebuild Neptune's production capabilities and in light of the fact that the new third-party suppliers will likely require long-term purchase commitments.

**JURISDICTION AND VENUE**

13.     The claims asserted herein arise under §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5. Jurisdiction is conferred by §27 of the 1934 Act, 15 U.S.C. §78aa.

14.     Venue is proper here pursuant to §27 of the 1934 Act. Acts and transactions giving rise to the violations of law complained of occurred here.

**PARTIES**

15.     Plaintiff Michael Bertuzzi purchased Neptune common stock as set forth in the attached Certification, which is incorporated herein by reference, and was damaged thereby.

- 5 -

16.     Defendant Neptune is a publicly traded Canadian company headquartered in Quebec, Canada.  Neptune stock has been listed and traded on the Nasdaq since August 2007.  During the Class Period, Neptune had approximately 59 million shares of common stock outstanding, which shares traded in efficient markets on both the Nasdaq under the symbol "NEPT" and on the Toronto Stock Exchange under the symbol "NTB."    The Company develops, manufactures and commercializes marine-derived omega-3 polyunsaturated fatty acids, or PUFAs, by extracting oils from Antarctic krill.  Until November 8, 2012, the Company's products were being distributed globally in 30 countries.  The Company's U.S. agent for service of process is CT Corporation Service, 111 Eighth Avenue, New York, New York 10011.

17.     Defendant Henri Harland ("H. Harland") is, and was throughout the Class Period, Neptune's founder, President, CEO and a director.  Prior to founding Neptune in 1998, H. Harland served as President and CEO of Gestion Harland Inc., a financial engineering group that he is still affiliated with and through which H. Harland receives a royalty of 1% on any Neptune sales and on other income of the Company for an indeterminate period of time which is paid semi-annually.

18.     Defendant Frédéric Harland ("F. Harland") is, and was throughout the Class Period, Neptune's Director of Finance.

19.     Defendant André Godin ("Godin") is, and was throughout the Class Period, Neptune's Chief Financial Officer ("CFO").

20.     The defendants referenced above in ¶¶17-19 are referred to herein as the "Individual Defendants."  The Individual Defendants are liable for the false statements pleaded herein, as those statements are each "group-published" information for which they are responsible.

## SUBSTANTIVE ALLEGATIONS

21.     Neptune began its operation in 1998 by developing a patented process for the extraction of marine biomasses.  The Company produces premium krill oil, mainly composed of

phospholipids, antioxidants and omega-3.  Until November 8, 2012, Neptune's Krill oil was sold in drums and/or softgels around the world to its global retail distributors who repackaged it and sold it globally.

22.     The Company first acquired its 14,887 square-foot Sherbrooke laboratory and production facility in October 2006.  Neptune's corporate offices are located in Laval, Quebec in a 5,007 square-foot leased office space.  Until November 8, 2012, all production took place and all inventories were stored at the Sherbrooke production facility.

23.     During the 2010 fiscal year (ended February 28, 2010), purportedly in response to increases in demand from its distributors, Neptune completed an initial expansion of the annual production capacity of the Sherbrooke production plant from 60,000 kilograms to 100,000 kilograms.  During the 2011 fiscal year (ended February 28, 2011), Neptune again increased its production capacity from 100,000 kilograms per year to 130,000 kilograms per year.

24.     An additional $21 million expansion of the Sherbrooke plant commenced in December 2011, from which Neptune expected to increase its annual krill oil production capacity to 300,000 kilograms.  The costs of this "2012 expansion project" were initially promised to be funded primarily by a Canadian federal government grant and interest-free loan, certain investment tax credits, a secured credit facility and a portion of Neptune's working capital.  Defendants said the 2012 expansion project was on track to be completed by the end of the Company's 2013 fiscal year (ending February 28, 2013).  Following the completion of the 2012 expansion project and before the end of fiscal 2014 (ending February 28, 2014), Neptune intended to further expand its Sherbrooke production plant to increase its annual production capacity to 500,000 kilograms of krill oil.

## MATERIALLY FALSE AND MISLEADING
## STATEMENTS ISSUED DURING THE CLASS PERIOD

25.    The Class Period commenced on December 12, 2011.  On that day, Neptune issued a press release entitled "Neptune Starts Phase-I Sherbrooke Plant Expansion."  The press release stated in pertinent part as follows:

> Neptune . . . announces the official start of its Phase I plant expansion, *generating within a year an additional production capacity of more than 150,000kg per year*.
>
>     "In order to meet the increasing demand for its products, Neptune will undergo a 40,000 square-feet expansion at its existing facility in Sherbrooke, Québec. *Neptune's plant expansion will be executed in two phases, allowing production up to 500,000kg of Neptune Krill oil per year*."
>
>                               *       *       *
>
>     "We have planned and structured a creative financing model, with the support of many parties as well as our bank," said Frédéric Harland, Director of Finance. "The expansion project will be financed through a mix of standard loans, interest-free loans subsidies *and by a cash contribution of Neptune for approximately 20% of the total cost by using part of the proceeds of its May 2011 financing*.  More details will be provided at a press conference to be held in Sherbrooke during the first quarter of 2012" he added.
>
>     "Today's investment allows for new process improvements at our manufacturing facility, strengthening thereby our manufacturing position based on our patent and industrial secrets, and enabling Neptune's capacity to provide its customers a reliable supply of the world's leading Neptune Krill Oils," said André Godin, CFO. "This new production line will secure supply for the increasing demand, *allowing for incremental gross margin*, as well as providing additional production capacity for new products currently under development. *This increase in production capacity will be completed without any interruption of the existing production line*.  Neptune's team has extensively worked on this expansion project; it is an exciting moment and a further reaffirmation of our growth action plan strategy," added the CFO.

26.    On January 17, 2012, Neptune issued a press release announcing its third quarter 2012 financial results and provided further detail and assurances concerning the success of the expansion efforts underway at the Sherbrooke production plant.  Concerning the Company's corporate status and business metrics, the press release issued that day quoted defendant F. Harland

- 8 -

as stating: "'We continue to build momentum as demonstrated by our solid third quarter results. . . .
As we look back at the past quarters, we expect continued sales growth driven by price and
quantities *and are confident in our growth strategy and commercial plans* . . . .'" During the
conference call that followed the issuance of the press release, defendants further elaborated on the
status of the expansion of the Sherbrooke production facility, emphasizing that the production
capacity enhancements would be accretive to the Company's financial results going forward.

27.    That same day, the Company filed with the SEC its Interim Consolidated Financial
Statement for the interim period ended November 30, 2011 as part of a Form 6-K, which was signed
by defendant H. Harland.   The Consolidated Financial Statement contained the following
representations concerning the Sherbrooke plant expansion:

> In December 2011, the Corporation announced the official start of its Phase I
> plant expansion. Financing in the amount of $11,000,000 was obtained shortly after
> the end of the third quarter. The financing is in the form of a standard loan in the
> amount of $4,500,000 bearing interest at prime rate plus 2% with a five year term, an
> interest-free loan in the amount of $3,500,000 with a ten year term, and a $3,000,000
> subsidy. Also in December 2011, the Corporation signed agreements amounting to
> approximately $700,000 with various suppliers with respect to the plant expansion.

28.    The Management Analysis of the Financial Situation and Operating Results - Three
and Nine-Month Periods Ended November 30, 2011, also filed as part of the Form 6-K, stated in
pertinent part as follows (dollar amounts in thousands):

> In December 2011, Neptune announced the official start of its Phase I plant
> expansion at its Sherbrooke plant, with the objective of generating within a year an
> additional production capacity of more than 150,000 kg per year in order to meet the
> increasing demand for its products. As part of the project, Neptune will undergo a
> 40,000 square-feet expansion at its existing facility. Neptune's plant expansion will
> be executed in two phases, *allowing for production up to 500,000 kg of Neptune
> Krill oil per year once it is completed vs 150,000 kg presently*. Neptune's Phase I
> plant expansion . . . is expected to be completed by fall 2012 . . . . The financing in
> the amount of $11,000 was also obtained in December 2011. The financing is in the
> form of a standard loan in the amount of $4,500 bearing interest at prime rate plus
> 2% with a five year term, an interest-free loan in the amount of $3,500 with a ten
> year term, and a $3,000 subsidy. Also in December 2011, the Corporation signed

- 9 -

agreements amounting to approximately $700 with various suppliers with respect to the plant expansion.

29.     The Form 6-K also contained the following certifications signed by defendants H. Harland and Godin:

FORM 52-109F2

CERTIFICATION OF INTERIM FILINGS

FULL CERTIFICATE

I, [Henri Harland/André Godin] of Neptune Technologies & Bioressources Inc., certify the following:

**1. Review:** I have reviewed the interim financial report and interim MD&A (together, the "interim filings") of Neptune Technologies & Bioressources Inc. (the "issuer") for the interim period ended November 30, 2011.

**2. No misrepresentations:** Based on my knowledge, having exercised reasonable diligence, the interim filings do not contain any untrue statement of a material fact *or omit to state a material fact required to be stated or that is necessary to make a statement not misleading in light of the circumstances under which it was made*, with respect to the period covered by the interim filings.

**3. Fair presentation:** Based on my knowledge, having exercised reasonable diligence, the interim financial report together with the other financial information included in the interim filings *fairly present in all material respects the financial condition*, financial performance and cash flows of the issuer, as of the date of and for the periods presented in the interim filings.

**4. Responsibility:** The issuer's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (DC&P) and internal control over financial reporting (ICFR), as those terms are defined in Regulation 52-109 respecting Certification of Disclosure in Issuers' Annual and Interim Filings (c. V-1.1, r.27), for the issuer.

**5. Design:** Subject to the limitations, if any, described in paragraphs 5.2 and 5.3, the issuer's other certifying officer(s) and I have, as at the end of the period covered by the interim filings.

(a)  designed DC&P, or caused it to be designed under our supervision, to provide reasonable assurance that

(i)  material information relating to the issuer is made known to us by others, particularly during the period in which the interim filings are being prepared; and

- 10 -

(ii)  information required to be disclosed by the issuer in its annual filings, interim filings or other reports filed or submitted by it under securities legislation is recorded, processed, summarized and reported within the time periods specified in securities legislation; and

(b)  designed ICFR, or caused it to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with the issuer's GAAP.

**5.1   Control framework:**  The control framework the issuer's other certifying officer(s) and I used to design the issuer's ICFR is the COSO (Committee of Sponsoring Organizations in the Treadway Commission) Internal Controls – Integrated Framework.

5.2  – N/A

5.3  – N/A

**6. Reporting changes in ICFR:**  The issuer has disclosed in its interim MD&A any change in the issuer's ICFR that occurred during the period beginning on September 1st, 2011 and ended on November 30th, 2011 that has materially affected, or is reasonably likely to materially affect, the issuer's ICFR.

30.     On March 9, 2012, Neptune issued a press release entitled "Neptune Technologies & Bioressources investing over $20M in Sherbrooke," which further elaborated on the Company's Sherbrooke expansion efforts then well underway.  The press release stated in pertinent part as follows:

In the presence of the prime minister of Québec, Jean Charest, Neptune Technologie & Biosressources and Sherbrooke Innopole are pleases [sic] to announce that the company will finalize its expansion plans in its Sherbooke plant, generating an investment of more than twenty million dollars and creating at least 40 new jobs.

*Neptune Technologies & Bioressources objective is to triple its production capacity of its plant by enlarging its facilities on Pepin Street.  The first phase is expected to be completed by November 2012, the excavation began last December.*

\*        \*        \*

The new two-level building with an area of 40,000 square feet will almost entirely be dedicated to the processes, in addition to the existing 12,000 square feet facility which accommodates labs, administrative offices and the current production facility.  *"The structure of the new plant is very innovative* in that it makes way for automation since the process will allow the central freezer to supply the production

- 11 -

line towards the building's extremities. *This will allow* greater flexibility for our production lines and *improved efficiency*, while also leaving space for future investments", says Eric Simard Vice-President of Science and Development at Neptune.

\*       \*       \*

*Neptune has always had an innovative approach, using the most advanced technology to achieve the highest level of productivity, efficiency and quality.* . . .

31.     On May 25, 2012, Neptune issued a press release announcing its consolidated financial results for the fiscal year ended February 29, 2012.  The press release quoted defendant F. Harland as stating: "'Revenues reached a record level of $19.1M directly attributable to Neptune's operational, nutraceutical business segment and complementary marketing strategies.  *Reaching record revenues year in and year out strongly reflects the kind of company Neptune is* along with effective marketing efforts and creativity.'"  The press release also quoted defendant Godin as stating that defendants were "'extremely pleased with Neptune's latest fiscal year outstanding results and profitability, and building on this momentum for fiscal year 2013 where revenues growth will be Neptune's primary focus.'"

32.     That same day, Neptune publicly issued its 2012 Annual Report, which was also posted to the investor relations portion of its website.  The 2012 Annual Report contained the following representations concerning the Sherbrooke plant expansion in defendants H. Harland and Godin's annual letter to shareholders:

A third very important initiative was the inauguration of Phase I of our expansion project for our production facility in Sherbrooke, Quebec.  *The plant will undergo a 40,000 square-foot expansion in two phases, when both phases are completed, the facility will be able to produce up to 500,000 kg of Neptune krill oil products per year.  The project will also allow us to introduce new process improvement, which will streamline and enhance out manufacturing and ensure we remain competitive.*

\*       \*       \*

- 12 -

*We anticipate that Phase I of our plant expansion in Sherbrooke will be completed in the fall of this year, and should increase our annual Neptune krill oils production capacity by more than 150,000 kg.*

33.     Neptune's 2012 Annual Report also included a section entitled "Neptune's Manufacturing Initiatives," which stated in pertinent part as follows:

*We are committed to continuously improve our manufacturing capabilities*

*One of Neptune's great competitive advantages is its manufacturing capability.* We have prioritized innovation and excellence in our processes and procedures, and as a result our production facilities make use of state-of-the-art technologies and applications. Retaining control of all aspects of our manufacturing helps us to fully exploit the patented processes and procedures as well as the trade secrets involved in the manufacture of our proprietary marine omega-3 phospholipids. Neptune's production platform integrates a unique combination of extraction technologies that permits to deliver products that have among the highest efficacy, purity and safety profiles in the industry. Our stringent manufacturing processes also enable us to attain optimum levels of product quality, cost efficiency and productivity.

As a part of our commitment to continuously improve our manufacturing capabilities, we are spearheading a $20 million investment in our primary manufacturing plant in Sherbrooke, Quebec. Demand for our pioneering products is rising steadily, and so our manufacturing capacity must increase to keep pace. Hence, in December 2011 we launched Phase I of the Company's plant expansion, *which will, by the end of 2012, increase our annual manufacturing capacity in Sherbrooke by 150,000 kg. A planned second phase of this project will ultimately enable us to produce up to 500,000 kg of Neptune krill oils per year. The design of the project allows us to undertake the expansion without any interruption to the existing production line*.

This expansion is also providing us with the opportunity to introduce additional process and technological improvements to our facility, *which should help the Company maintain gross margins and provide the capacity required to develop and manufacture new marine omega-3 phospholipid products*.

\*       \*       \*

*With these key manufacturing initiatives underway, Neptune is very well positioned to meet the growing demand for its products around the world*.

34.     The 2012 Annual Report also contained the following representations concerning Neptune's purported "Focus on Environmental Responsibility":

- 13 -

As leaders in the science-based nutraceutical and pharmaceutical omega-3 phospholipid markets, Neptune has a clear responsibility not only to improve human health but also to responsible environmental stewardship.

\*     \*     \*

*Going forward, Neptune will continue to meet and exceed the highest standards for sustaining the environments in which we may have an impact.*

35.     The Management Analysis of the Financial Situation and Operating Results – 2012 Consolidated Financial Statements for the Years Ended February 29, 2012 and February 28, 2011 and as at March 1, 2010, which also formed part of the 2012 Annual Report, further provided in pertinent part as follows:

Following the end of the fiscal year, on March 9, 2012 and in the presence of the Premier of Quebec, Jean Charest, Neptune announced that the company had finalized its expansion plans at its Sherbooke plant, which is expected to generate an investment of more than $20,000 and create at least 40 new jobs. *Neptune expects to triple its production capacity with the expansion of the Sherbrooke plant. The first phase is expected to be completed by November 2012.* The excavation began in December 2011. . . . The new two-level building with an area of 40,000 square feet will almost entirely be dedicated to the production process, in addition to the existing 12,000 square feet facility, which accommodates labs, administrative offices and the current production facility. *The structure of the new plant is very innovative and will allow greater flexibility for Neptune's production lines and improved efficiency and productivity for the Company.*

\*     \*     \*

In December 2011, the Corporation announced the official start of its Phase I plant expansion. Financing agreements in the amount of $15,500 were entered into shortly after the end of the third quarter. The financing is in the form of a standard loan in the amount of $9,000 bearing interest at prime rate plus 2% with a five year term, an interest-free loan in the amount of $3,500 with a ten year term, and a $3,000 government grant. As at February 2012, the Corporation signed agreements amounting to approximately $860 with various suppliers with respect to the plant expansion.

36.     Portions of the 2012 Annual Report were filed with the SEC on Form 40-F, which was signed by defendants H. Harland and Godin and contained certifications signed by defendants H. Harland and Godin similar to those detailed above in ¶29.

- 14 -

37.     During a May 31, 2012 conference call with analysts and other investors, defendants provided further detail and assurances concerning the status of the Sherbrooke expansion efforts.

38.     On July 16, 2012, Neptune issued a press release announcing its first quarter 2013 financial results.  In the press release issued that day, defendant F. Harland was quoted as stating: "'*In the first quarter, we once again executed a triple play – simultaneously investing for growth* and IP protection, increasing market share, and investing in research and development programs. *With this drive, we entered this new fiscal year exceptionally well positioned to maintain our operational performances, execute our growth strategy, and continue delivering positive results*.'" The press release also quoted defendant Godin as stating: "'Neptune had a strong and record-breaking fiscal year 2012 *and the momentum has kept on in the first quarter*.'"

39.     That same day, Neptune filed its Interim Consolidated Financial Statement with the SEC as part of a Form 6-K, which was signed by defendant H. Harland.  The Form 6-K contained the following representations concerning the Sherbrooke plant expansion:

> In December 2011, the Corporation announced the official start of its Phase I plant expansion. Financing agreements in the amount of $15,500,000 were entered into shortly after the end of the third quarter. The financing is in the form of a standard loan in the amount of $9,000,000 bearing interest at prime rate plus 2% with a five-year term, an interest-free loan in the amount of $3,500,000 with a ten-year term, and a $3,000,000 government grant. As at May 31, 2012, the Corporation signed agreements amounting to approximately $1,100,000 with various suppliers with respect to the plant expansion.

40.     The Management Analysis of the Financial Situation and Operating Results - Three and Nine-Month Periods Ended February 29, 2012, also filed as part of the Form 6-K with the SEC that day, further provided in pertinent part as follows:

> On March 9, 2012 and in the presence of the Premier of Québec, Jean Charest, Neptune announced that the corporation had finalized its expansion plans at its Sherbooke plant, an expected investment of between $23,000 and $25,000 and expected to create at least 40 new jobs. *Neptune expects to triple its production capacity with the expansion of the Sherbrooke plant. The first phase which should increase the capacity to 300MT per year is expected to be completed by the end of*

- 15 -

*the current fiscal year. Phase two, which should increase the capacity from 300MT per year to 500MT per year, is expected to be completed by Q2-2014.* The excavation began in December 2011. . . . The new two-level building with an area of 40,000 square feet will almost entirely be dedicated to the production process, in addition to the existing 12,000 square feet facility, which accommodates labs, administrative offices and the current production facility. *The structure of the new plant is very innovative and will allow greater flexibility for Neptune's production lines and improved efficiency and productivity for the Corporation.*

*          *          *

In December 2011, the Corporation announced the official start of its Phase I plant expansion. Financing agreements in the amount of $15,500 were entered into shortly after the end of the third quarter. The financing is in the form of a standard loan in the amount of $9,000 bearing interest at prime rate plus 2% with a five-year term, an interest-free loan in the amount of $3,500 with a ten-year term, and a $3,000 government grant. As at May 31, 2012, the Corporation signed agreements amounting to approximately $1,100 with various suppliers with respect to the plant expansion.

41.     The July 16, 2012 Form 6-K also contained certifications similar to those detailed above in ¶29 that were again signed by defendants H. Harland and Godin.

42.     On September 11, 2012, Neptune issued a press release announcing its preliminary second quarter 2013 financial results. The press release quoted defendants commenting on the Company's status and the Sherbrooke expansion efforts in pertinent part as follows:

*"Neptune's plant expansion is on schedule with completion expected by the first quarter of calendar 2013. The annual production capacity increase upon completion to 300,000kg of krill oil from 150,000kg will be more than welcome. Neptune continues to take a strategic approach to growth and structure key long-term relationships with distributors"* said Frederic Harland, Director of Finance.

43.     The statements referenced above in ¶¶25-42 were each materially false and misleading because they failed to disclose the following adverse facts which were known to defendants or recklessly disregarded by them:

(a)     The Company had installed larger acetone storage tanks at the Sherbrooke production plant that facilitated their storing dangerously high levels of acetone that exceeded those permitted by the certificate of authorization issued by the Québec Ministry of Environment in 2002;

- 16 -

(b)     The Company had failed to obtain permission from the Quebec government to commence expansion of the Sherbrooke production facility;

(c)     The Company had been chasing market share at the cost of margins and would see its profit margins collapse by the end of the Class Period, plummeting from 51% in the same period one year earlier to 38%, as reported on October 15, 2012; and

(d)     As a result, the Company was not on track to "*maintain [its] operational performances, execute [its] growth strategy, [or to] continue delivering positive results*."

44.     On September 14, 2012, Neptune filed with the SEC a registration statement on Form F-10 (the "Registration Statement"), which would later be utilized to conduct the Company's registered follow-on stock offering (the "Offering") following an amendment on September 20, 2012.  On or about September 26, 2012, Neptune filed its final Prospectus for the Offering ("Prospectus"), which forms part of the Registration Statement and which became effective upon filing.

45.     The Registration Statement and Prospectus contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading and was not prepared in accordance with the rules and regulations governing its preparation.

46.     First, the Registration Statement represented that the Company "believe[d]" that its "ability to provide a *safe* and effective product" was a "key factor in building and sustaining [its] credibility with [its] distribution partners." This statement was materially false and misleading in light of the fact that the Company was storing dangerously high levels of acetone at the Sherbrooke production facility that exceeded those permitted by the certificate of authorization issued by the Québec Ministry of Environment in 2002.  The Company had also failed to obtain permission from the Quebec government to commence expansion of the Sherbrooke production facility.

- 17 -

47.     Second, the Registration Statement represented that: (i) the Company was then "in the process of completing an expansion of [its krill oil production] facility that, when completed, *[was] expected to enable [it] to produce approximately 300,000 kilograms of krill oil annually*," (ii) "[t]o date during the 2012 fiscal year, . . . Neptune ha[d] continued the first phase of the expansion project of its Sherbrooke plant, *which [was] anticipated to be completed by the end of [its] current fiscal year*," and (iii) defendants then "believe[d] this increase in production capacity *[would] help position [Neptune] to meet growing market demand for Neptune's krill oil product*." These statements were materially false and misleading because they omitted to disclose that the Company had not obtained the necessary governmental permits to commence the expansion operations and had failed to address the dangerously high acetone levels.

48.     Third, the Prospectus represented that approximately $5 million of the proceeds from the Offering would be used "to fund the expansion of [Neptune's] Sherbrooke plant . . . intended to increase Neptune's annual production capacity to 500,000 kilograms of krill oil." This statement was materially false and misleading because it omitted the facts that the Company had not obtained the necessary governmental permits to commence the expansion operations and that it was storing dangerously high levels of acetone at the Sherbrooke production plant in violation of its certificate of authorization issued by the Québec Ministry of Environment in 2002.

49.     Fourth, Registration Statement contained numerous statements concerning Neptune's "Manufacturing and Facilities." These statements were materially false and misleading because the Company had not obtained the necessary governmental permits to commence the expansion efforts and because it was then storing dangerously high levels of acetone at the Sherbrooke production plant in violation of its certificate of authorization issued by the Québec Ministry of Environment in 2002. The Registration Statement stated in pertinent part as follows:

Since 2010, *the production capacity of the Sherbrooke plant has steadily increased*. During the 2010 fiscal year, in response to increase in demand from its distributors, Neptune completed an initial expansion of the annual production capacity of the Sherbrooke plant from 60,000 kilograms to 100,000 kilograms. In the 2011 fiscal year, Neptune increased its production capacity from 100,000 kilograms per year to 130,000 kilograms per year. *An additional $21.0 million expansion of the Sherbrooke plant is currently ongoing, which Neptune expects will increase its annual krill oil production capacity to 300,000 kilograms. Neptune will be required to obtain a permit from the Minister of Environment Québec that will allow it to bring its krill oil capacity under its current permit from 100,000 kilograms per year to 300,000 kilograms per year.* . . . The costs of the expansion project are expected to be funded primarily by a Canadian Federal government grant and interest-free loan, certain investment tax credits, a secured credit facility and a portion of Neptune's working capital. *The expansion is anticipated to be completed by the end of our current fiscal year. Following the completion of its ongoing expansion project and before the end of 2014, Neptune intends to further expand its Sherbrooke plant to increase its annual production capacity to 500,000 kilograms of krill oil.*

*The new two-level facility currently being constructed is adjacent to Neptune's initial production plant and will have a gross area of approximately 40,000 square feet. The facility will almost entirely be dedicated to Neptune's production process. Neptune will continue to operate its initial facilities, which have a gross area of approximately 12,000 square feet and accommodate Neptune's laboratories, administrative offices and initial production plant. The structure is designed to allow greater flexibility for Neptune's production lines and is expected to improve Neptune's efficiency and productivity.*

*Neptune adheres to Good Manufacturing Practices, or GMP, mandated by the Natural Health Products Directorate of Health Canada, or NHPD, and successfully passed an audit performed by the NHPD in May 2011.*

50.     Fifth, the Prospectus represented that "Neptune's production plant in Sherbrooke ha[d] been audited by NHPD, which issued a certificate of GMP compliance." This statement was materially false and misleading because the Company had not obtained the necessary governmental permits to commence the expansion of the Sherbrooke production plant and was storing dangerously high levels of acetone at the Sherbrooke production plant in violation of its certificate of authorization issued by the Québec Ministry of Environment in 2002.

51.     Sixth, the Registration Statement represented that Neptune's employees in the Sherbrooke production plant "*possess[ed] specialized skills and knowledge in the following fields,*

*which [were] valuable assets of the Company*," including: "*quality assurance/quality control,*" "*regulatory compliance related to the Company's operations,*" and "*legal matters*." These statements were materially false and misleading because the Company had not obtained the necessary governmental permits to commence the expansion of the Sherbrooke production plant and was storing dangerously high levels of acetone at the Sherbrooke production plant in violation of its certificate of authorization issued by the Québec Ministry of Environment in 2002.

52.      Seventh, the Registration Statement provided forward earnings guidance based on *all data then available to defendants*. The statements were materially false and misleading because the Company had not obtained the necessary governmental permits to commence the expansion of the Sherbrooke production plant and was storing dangerously high levels of acetone at the Sherbrooke production plant in violation of its certificate of authorization issued by the Québec Ministry of Environment in 2002. The Registration Statement stated in pertinent part as follows:

> On September 10, 2012, Neptune provided revenue guidance for the recently completed second quarter of fiscal 2013 ended August 31, 2012. Pursuant to this guidance, Neptune's management expressed its confidence that . . . (ii) *first half revenues for fiscal 2013 will be in the range of $13.6 million to $14.1 million compared to $8.6 million in revenues during the first half of fiscal 2012.*

53.      Under the rules and regulations governing the preparation of the Registration Statement, Neptune was required to disclose the problems with its Sherbrooke production facility, including the facts that the Company was storing dangerously high levels of acetone that exceeded those permitted and that the Company had failed to obtain the necessary permits to undertake the Sherbrooke production plant expansion. The Registration Statement, however, contained no such disclosures.

54.      The Offering was successful for the Company though. On September 25, 2012, more than 8.4 million shares of Neptune common stock were sold to the public at $4.10 per share, raising more than $34 million in gross proceeds for Neptune.

55.    On October 15, 2012, Neptune issued a press release announcing it second quarter 2013 financial results. The press release quoted defendant Godin as stating: "*Neptune had a strong and record-breaking fiscal year 2012 and the momentum has kept on in the first and second quarter of fiscal 2013.*"

56.    That same day, Neptune filed with the SEC its Interim Consolidated Financial Statement for the interim period ended August 30, 2012 as part of a Form 6-K, which as signed by defendant H. Harland.  The Form 6-K contained the following representations concerning the Sherbrooke plant expansion:

> In December 2011, the Corporation announced the official start of its Phase I plant expansion, *which Neptune expects will increase its annual krill oil production capacity to 300,000 kilograms. The cost of the expansion project is estimated at $21,000,000* and is expected to be funded primarily by a Canadian federal government grant and interest-free loan, certain investment tax credits, a secured credit facility and a portion of Neptune's working capital. *Financing agreements in the amount of $15,500,000 were negotiated shortly after the end of the third quarter of fiscal 2012*. The financing is in the form of a standard loan in the amount of $9,000,000 bearing interest at prime rate plus 2% with a five-year term, an interest-free loan in the amount of $3,500,000 with a ten-year term, and a $3,000,000 government grant.  As at August 31, 2012, the Corporation signed agreements amounting to approximately $320,000 with various suppliers with respect to the plant expansion.

57.    The Management Analysis of the Financial Situation and Operating Results – Three and Nine-Month Periods Ended August 30, 2012, also filed as part of the Form 6-K with the SEC that day, further provided in relevant part:

> In December 2011, the Corporation announced the official start of its Phase I plant expansion, *which Neptune expects will increase its annual krill oil production capacity to 300,000 kilograms*. The cost of the expansion project is estimated at $21,000 and is expected to be funded primarily by a Canadian federal government grant and interest-free loan, certain investment tax credits, a secured credit facility and a portion of Neptune's working capital. *Financing agreements in the amount of $15,500 were negotiated shortly after the end of the third quarter of fiscal 2012*. The financing is in the form of a standard loan in the amount of $9,000 bearing interest at prime rate plus 2% with a five-year term, an interest-free loan in the amount of $3,500 with a ten-year term, and a $3,000 government grant.  As at

August 31, 2012, the Corporation signed agreements amounting to approximately $320 with various suppliers with respect to the plant expansion.

58.     The October 15, 2012 Form 6-K also contained certifications similar to those detailed above in ¶29 that were again signed by defendants H. Harland and Godin.

59.     The statements referenced above in ¶¶44-52, 55-58 were each materially false and misleading because they failed to disclose the following adverse facts which were known to defendants or recklessly disregarded by them:

(a)     The Company had installed larger acetone storage tanks at the Sherbrooke production plant that facilitated their storing dangerously high levels of acetone that exceeded those permitted by the certificate of authorization issued by the Québec Ministry of Environment in 2002;

(b)     The Company had failed to obtain permission from the Quebec government to commence expansion of the Sherbrooke production facility

(c)     The Company had been chasing market share at the cost of margins and would see its profit margins collapse by the end of the Class Period, plummeting from 51% in the same period one year earlier to 38%, as reported October 15, 2012; and

(d)     As a result, "*the momentum[ had not] kept on in the first and second quarter of fiscal 2013*" for Neptune to achieve strong financial results in fiscal 2013.

60.     Neptune's stock price would precipitously decline between November 8, 2012 before the close of trading, when the explosion and fire completely destroyed its Sherbrooke production plant, and November 26, 2012, when the Company's stock, which had been halted by the Nasdaq, resumed trading, plummeting $1.18 per share – *approximately 32% of its closing price on November 7, 2012, the evening before the explosion* – on extremely high trading volume of more than 3.8 million shares trading.

- 22 -

61.     Initial reports disclosed that the explosion and fire had completely destroyed Neptune's current production plant that was in operation and damaged the expansion facility under construction.  Since all of Neptune's krill oil products were manufactured at the plant that was destroyed, production was completely halted and remains halted indefinitely.  Neptune's entire inventory of krill oil products was stored at the production plant and was destroyed as well.  Initial reports determined that the fire and explosion were started in one of the plant's reservoirs containing highly flammable acetone, commonly used as paint thinner or nail polish remover, which the Company used in its krill oil production.

62.     The Company's own November 12, 2012 press release stated in relevant part that "[a]n investigation [was] currently underway to determine the cause of the explosion and fire, ***which according to preliminary reports affected, amongst other things, some of the acetone reserves used by Neptune for its krill oil extraction process***."  The press release also explained that "[t]rading of Neptune's common shares on the NASDAQ Stock Market ("NASDAQ") and the Toronto Stock Exchange (the "TSX") ha[d] been halted indefinitely [and] that the trading halts on its common shares [would] not be lifted until such time when additional information is disclosed on Neptune's plans going forward and NASDAQ and the TSX are satisfied that ***investors have sufficient information on the business and operations of Neptune going forward to make informed investment decisions***."

63.     Beginning on November 16, 2012, multiple media sources reported that the Quebec Ministry of Environment issued the Company two notices of non-compliance, one addressing excessive levels of acetone present on the premises at the time of the explosion and another citing the Company for failing to obtain a permit to expand its Sherbrooke production facilities.

- 23 -

64.     According to a report published by Radio Canada on November 16, 2012, in 2002 the Company was given authorization to store a total of 33,000 liters of acetone outside the Sherbrooke production plant, and another 6,000 liters inside.  However, Urgence-Environnement technicians dispatched to the scene of the November 8th fire calculated that approximately 15,000 liters of acetone had burned – creating a huge cloud of black smoke – and another 27,000 liters were contained in other reservoirs at the plant.  Based on those calculations, Radio Canada estimated that the Neptune plant housed 3,000 liters more than it was authorized to house.

65.     Radio Canada also reported that the Company had failed to obtain permission to begin its expansion work on the Sherbrooke production plant, which commenced during fiscal 2011 and was designed to triple the production capacity of the site at a cost of more than $20 million. Radio Canada also reported that the Quebec Ministry of Environment never gave its approval for the work to begin.

66.     On November 17, 2012, Montreal-based *Sault Star* published a report entitled "Quebec plant in blast accused of storing excess amount of dangerous chemicals," which stated in relevant part:

> ***Quebec's environment ministry accuses the factory that exploded killing three people and wounding 19 others had illegally stored high amounts of dangerous liquid and conducted renovations without a permit.***
>
> About 15,000 litres of acetone, a common solvent, ignited on Nov. 8 and gutted the factory Neptune Technologies and Bioresources, located in Quebec's Eastern Townships.  Two workers were found dead under rubble and a third died in hospital from burns.
>
> The environment ministry said Friday Neptune was licensed to store 33,000 litres of acetone outside its factory and 6,000 litres inside.  ***However, the ministry told QMI Agency Friday there was storage space at the factory for 92,000 litres of acetone.  The ministry told QMI Agency Friday that it was considering taking Neptune to court over the factory's alleged illegal acetone storage.***
>
> ***Moreover, the Quebec government accused the company of conducting renovations on the factory without obtaining the proper permits.***

- 24 -

A well-placed source with Neptune told QMI Agency the company asked the environment ministry for an emergency meeting to discuss the allegations. The source said Neptune will comment publicly on the allegations after the meeting.

67.     On November 17, 2012, *CBC* provided additional statements by a Quebec Ministry of Environment official expressly stating that defendants had been told that regulatory approval of the Sherbrooke production plant expansion was required *before work commenced*:

> According to information obtained by Radio-Canada, the quantity of acetone inside the factory was higher than the amount authorized by the ministry.

> In 2002, the Ministry of Environment authorized Neptune Technologies to keep 33,000 litres of acetone outside the factory and 6,000 litres inside.

> Investigators have found that the quantity of acetone was much higher, according to Radio-Canada.

> Environment Quebec officials estimated that 15,000 litres of acetone was burned in the fire that followed the explosion.

> Investigators also discovered other reservoirs in the rubble, with a total capacity of 27,000 litres.

> Lise Vaillancourt, a senior official with Quebec's Environment Ministry, said officials aren't yet sure exactly how much surplus acetone was being stored at the facilities.

> *Vaillancourt said that notices of non-compliance have been sent to the company.*

> *The Ministry will look into what action it can take under the Environmental Quality Act to deal with the breach of standards.*

> *              *              *

> Neptune Technologies had also begun to expand the capacity of its factory.

> According to Radio-Canada, the expansion was not authorized by the ministry. *Vaillancourt said she met with the director of Neptune Technologies earlier this year and they discussed the fact that specific standards must be met before the work could begin.*

68.     In connection with the resumption of trading in the Company's stock on November 26, 2012, the Company issued a press release addressing its "Action Plan to Resume Operations and

Supply Customers." The press release stated in relevant part that the Company needed to engage "one or more strategic partners for the outsourcing of production for Neptune Krill Oil® products, both as an interim measure to ensure certain levels of production prior to its new plant being fully operational and as a longer-term strategy to diversify sources and means of production." However, the press release also warned that "Neptune's operations for the foreseeable future, particularly during an initial transition period, are expected to yield significantly lower sales margins compared to the usual sales margins prior to the incident."

69.    The November 26th press release also stated that while "Neptune ha[d] insurance coverage in place covering among other things property damage, business interruption and general liability," *that coverage was limited to "specified amounts and subject to limited deductibles and certain exclusions."* Defendants also stated they could only predict the availability of coverage, if any, *"when Neptune's insurance claims are settled,"* adding that *"[d]ue to the extent of the damage and ongoing investigation, the amount recoverable under our insurance policies and the collection of such amounts, if any, will most likely take several months."* The press release also stated that the *"[t]iming of the reconstruction [was] still uncertain and [would] depend on a range of factors, including the length and results of the investigation currently underway to determine the cause of the incident."* Concerning the proceeds from the September 25, 2012 Offering, the press release advised that *"[i]f Neptune is able to execute its Plan successfully and recover sufficient amounts under its insurance policies* . . . Neptune believes that the proceeds of the Offering can ultimately be deployed, over a longer period of time than initially planned given the incident, in substantially the same allocation as was disclosed in connection with the Public Offering, *except that the amount of approximately $US5 million initially allocated to the expansion of its Sherbrooke plant may now otherwise be used towards the production of Neptune*

- 26 -

*Krill Oil® products, either in connection with the reconstruction of an operational production facility or partnerships and/or arrangements with strategic partners for the production of Neptune Krill Oil® products.*" Finally, the press release acknowledged that "*[o]n November 16, 2012, Neptune received from the Québec Ministry of Environment a notice alleging environmental non-compliance relating to specific equipment acquisitions by Neptune and its plant expansion.*"

## DEFENDANTS' SCIENTER

70.     Defendants are Neptune and its top officers and directors. Each ran Neptune as a manager, dealing with important issues facing Neptune's business, and controlled the false statements concerning Neptune's Class Period operational and financial status, and Neptune's ability to achieve its target revenues and earnings, in order to raise investment capital to fund the Sherbrooke production plant expansion.

71.     Each of the Individual Defendants, by virtue of their high-level positions with Neptune, directly participated in the management of Neptune, was directly involved in the day-to-day operations of Neptune at the highest levels and was privy to confidential proprietary information concerning Neptune and its business, operations, the Sherbrooke production plant expansion, financial statements and financial condition and was aware of, or deliberately disregarded, that false and misleading statements were being made by and regarding the Company. Because of their managerial positions with Neptune, each of the Individual Defendants had access to the adverse undisclosed information about Neptune's business, financial condition and prospects and knew (or deliberately disregarded) that the adverse facts alleged herein rendered the positive representations made during the Class Period materially false and misleading.

72.     Each of the Individual Defendants was personally familiar with the Sherbrooke production plant expansion efforts because they were personally overseeing them. As a result of their monitoring, the Individual Defendants were aware that Neptune was not in compliance with its

agreements with the Quebec government, did not have the proper permits in place, and that, as such, Neptune was at great risk of not being able to meet its projected financial results.

73.     Each of the Individual Defendants participated in or failed to prevent the false reports regarding Neptune's operational and financial condition during the Class Period to maintain the Company's high stock price, to obtain financing for the Sherbrooke production plant expansion, and in the case of defendant H. Harland, to increase his take on his 1% royalty payment.

## LOSS CAUSATION/ECONOMIC LOSS

74.     During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated Neptune's stock price and operated as a fraud or deceit on Class Period purchasers of Neptune stock by misrepresenting the Company's business success and future business prospects.  Defendants achieved this façade of success, growth and strong future business prospects by blatantly misrepresenting the Company's operational and financial condition.  Later, however, when defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, Neptune stock fell precipitously as the prior artificial inflation came out of Neptune's stock price.  As a result of their purchases of Neptune stock during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

75.     The significant decline in Neptune's stock price at the end of the Class Period was a direct result of the nature and extent of defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of Neptune's stock price declines negate any inference that the loss suffered by plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the defendants' fraudulent conduct.  During the same period in which Neptune's stock price fell as a result of defendants' fraud being revealed, the Standard & Poor's 500 securities index actually increased.

76.     The economic loss, *i.e.*, damages, suffered by plaintiff and other members of the Class was a direct result of defendants' fraudulent scheme to artificially inflate Neptune's stock price and the subsequent significant decline in the value of Neptune's stock when defendants' prior misrepresentations and other fraudulent conduct were revealed.

## CLASS ACTION ALLEGATIONS

77.     This is a class action on behalf of purchasers of Neptune common stock between December 12, 2011 and November 8, 2012, excluding defendants (the "Class"). Excluded from the Class are officers and directors of the Company, as well as their families and the families of the defendants. Class members are so numerous that joinder of them is impracticable.

78.     Common questions of law and fact predominate and include: (i) whether defendants violated the 1934 Act; (ii) whether defendants omitted and/or misrepresented material facts; (iii) whether defendants knew or recklessly disregarded that their statements were false; and (iv) whether the price of Neptune's common stock was inflated during the Class Period and the extent of and appropriate measure of damages.

79.     Plaintiff's claims are typical of those of the Class. Prosecution of individual actions would create a risk of inconsistent adjudications. Plaintiff will adequately protect the interests of the Class. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### For Violations of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

80.     Plaintiff incorporates by reference ¶¶1-79 herein.

81.     Defendants violated §10(b) and Rule 10b-5 by:

      (a)     Employing devices, schemes and artifices to defraud;

(b)     Making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

(c)     Engaging in acts, practices and a course of business that operated as a fraud or deceit upon the Class in connection with their purchases of Neptune common stock.

82.     Class members were damaged as they paid artificially inflated prices for Neptune's common stock in reliance on the integrity of the market.

## COUNT II

### For Violations of §20(a) of the 1934 Act
### Against All Defendants

83.     Plaintiff incorporates by reference ¶¶1-82.

84.     The Individual Defendants acted as controlling persons of the Company within the meaning of §20(a) of the 1934 Act, 15 U.S.C. §78t(a), as alleged herein.  By virtue of their stock ownership, and high-level positions, and participation in and/or awareness of the Company's operations, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading.  Neptune controlled the Individual Defendants and all of its employees.

85.     By reason of such wrongful conduct, the defendants are liable pursuant to §20(a) of the 1934 Act.  As a direct and proximate result of the wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, individually and on behalf of the Class, prays for judgment as follows:

A.      Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.      Awarding plaintiff and other members of the Class damages together with interest thereon;

C.      Awarding plaintiff and other members of the Class costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts' fees and other costs and disbursements; and

D.      Awarding plaintiff and other members of the Class such equitable/injunctive or other and further relief as may be just and proper under the circumstances.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:  December 19, 2012                    ROBBINS GELLER RUDMAN
                                              & DOWD LLP
                                            SAMUEL H. RUDMAN
                                            DAVID A. ROSENFELD


                                            SAMUEL H. RUDMAN

                                            58 South Service Road, Suite 200
                                            Melville, NY  11747
                                            Telephone: 631/367-7100
                                            631/367-1173 (fax)
                                            srudman@rgrdlaw.com
                                            drosenfeld@rgrdlaw.com


                                    - 31 -

ZELDES & HAEGGQUIST, LLP
AMBER L. ECK
625 Broadway, Suite 906
San Diego, CA  92101
Telephone:  619/342-8000
619/342-7878 (fax)
ambere@zhlaw.com

Attorneys for Plaintiff

\

Neptune Technologies & Bioressources, Inc.

### CERTIFICATION OF NAMED PLAINTIFF
### PURSUANT TO FEDERAL SECURITIES LAWS

Michael Bertuzzi ("Plaintiff") declares:

1.      Plaintiff has reviewed a complaint and authorized its filing.

2.      Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff has made the following transactions during the Class Period in the securities that are the subject of this action:

See Schedule A

5.      Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _18_ day of _December_, 2012.

_____
MICHAEL BERTUZZI

## SCHEDULE A

| Trade Date | Action (Buy/Sell) | Quantity | Price Per Share | Total Cost |
|---|---|---|---|---|
| 3/27/2012 | Buy | 2000 | $3 $\frac{13}{}$ | $6260 |
| 4/26/2012 | Buy | 1000 | $3 $\frac{29}{}$ | $3290 |
| 12/17/2012 | Sell | 4000 | $2 $\frac{14}{}$ | $8559 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Michael Bertuzzi – Neptune Technologies & Bioressources, Inc.                    1